UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

——————————————————————X

MARGARET WRAGG,

                 Plaintiff,

-against-

UNITED HOMES, LLC, UNITED PROPERTY
GROUP, LLC, FAIRMONT FUNDING LIMITED,
FIRST UNIVERSAL NETWORK,
PETER JACKSON, BENJAMIN TURNER,
AMERICA'S SERVICING COMPANY,
WILSHIRE CREDIT CORPORATION,
XYZ-1 CORPORATION, and XYZ-2
CORPORATION  (Said names being fictitious,
it being the intention of Plaintiff to designate
any corporation having a legal interest in
Plaintiff's mortgages),

                 Defendants

——————————————————————X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 0 1 2004 ★

**BROOKLYN OFFICE**

Civil Action No.

**COMPLAINT**

# 04 - 1368

**JURY TRIAL DEMANDED**

DEARIE, J.

LEVY, M.J.

       MARGARET WRAGG, by and through her attorneys, SOUTH BROOKLYN LEGAL

SERVICES, as and for her complaint, alleges as follows:

## PRELIMINARY STATEMENT

       1. Plaintiff Margaret Wragg is a 68-year-old African-American woman and first-time

home buyer who fell prey to a common predatory lending scheme called "property flipping."

Defendants United Property Group, LLC and United Homes, LLC (collectively referred to as

"United Homes"), purchased the subject property located at 4 Martense Court, Brooklyn, New

York at a discount and, in conjunction with the lender, Fairmont Funding Limited ("Fairmont"),

1

caused the property to be fraudulently over-appraised by approximately $150,000. United Homes substantially profited from the transaction by marketing and selling the property to Ms. Wragg for the over-appraised value of $399,000, less than three months after United Homes purchased it for $230,000. United Homes purchased the subject property from a company named Golani, Inc., which bought the subject property for $180,000 only three weeks before it sold the subject property to United Homes. Upon information and belief, at the time of the sale of the subject property to Ms. Wragg, the true market value of the property was $250,000. Fairmont profited from the transaction by providing Ms. Wragg with two mortgages at the inflated purchase price, one of them entirely exceeding the actual value of the property, and by charging her considerable fees.

2. Moreover, United Homes represented to Ms. Wragg that she could afford the house based on rental income, but the subject property is legally designated as a one-family home, and renting a unit is illegal. Even including the illegal rental income, however, the monthly mortgage payments would have actually exceeded Ms. Wragg's monthly income, a fact which Fairmont, United Homes, and Benjamin Turner, her purported closing attorney, blatantly disregarded.

3. As a result of this scheme, Ms. Wragg is struggling to pay fraudulently inflated monthly mortgage payments, and is at risk of foreclosure. She devoted her live savings of $20,000 for a downpayment to purchase the property. She may now lose her home and investment due to United Homes and Fairmont's illegal and unscrupulous tactics. Upon information and belief, United Homes engages in a pattern and practice of property flipping, specifically targeting non-white first-time homebuyers for unfavorable home sales and financing.

2

## JURISDICTION

4. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 for claims under the Truth in Lending Act 15 U.S.C. § 1601 *et seq.*; the Fair Housing Act 42 U.S.C. §§ 3604, 3605; the Equal Opportunity to Credit Act 15 U.S.C. § 1691 *et seq.*; and for civil rights claims under 42 U.S.C. §§ 1981, 1982 and 1985. The Court also has jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's state law claims.

## VENUE

5. Venue lies in this District pursuant to 28 U.S.C. § 1391(b).

## PARTIES

6. Margaret Wragg is a 68-year-old African-American woman who is a retired Board of Education school aide. She lives with her 28-year-old son, David Wragg, who is a student and works part-time as a delivery driver for a laboratory. Ms. Wragg is a first-time homeowner who had no experience with the process of buying a home until she purchased the subject property at 4 Martense Court, Brooklyn, New York 11226. Indeed, until she moved into the subject property, she had been living in the same apartment for almost 25 years.

7. United Homes, LLC, is a company organized under the laws of New York, and maintains its principal place of business at 87-20 139th Street, Briarwood, New York, 11435. As described above, this is the same address as United Property Group, LLC; accordingly, upon information and belief, United Homes and United Property Group are inextricably connected, and as such, they will be collectively referred to throughout this complaint as "United Homes." United Homes also maintains an office at 32 Fourth Avenue, Brooklyn, NY 11217.

3

8. United Property Group, LLC, is a company organized under the laws of New York, and maintains its principal place of business at 87-20 139th Street, Briarwood, New York, 11435. United Property Group purchased the subject property on August 27, 2002 for $230,000, and sold the property to Ms. Wragg less than three months later for $399,000. Upon information and belief, United Property Group is inextricably connected with United Homes, LLC; for example, they share the same principal place of business.

9. Fairmont Funding Limited is a company organized under the laws of New York, and a licensed mortgage lender in New York. Its principal place of business is located at 39 West 37th Street, 4th Floor, New York, New York 10018. Fairmont gave Ms. Wragg two mortgages to purchase the subject property. Upon information and belief, Fairmont, in conjunction with United Homes, caused the subject property to be overappraised. In addition, Fairmont charged Ms. Wragg considerable fees, and failed to include some of these fees in the finance charge in violation of the Truth in Lending Act.

10. First Universal Network is a company organized under the laws of New York, and a licensed mortgage broker in New York. Its principal of business is 20F Robert Pitt, Suite 209, Monsey, New York, 10952. Upon information and belief, First Universal Network acted as a mortgage broker in the subject transaction, and received compensation in the form of numerous loan fees, despite Ms. Wragg's lack of awareness that a mortgage broker was involved.

11. Peter Jackson is a licensed appraiser in the State of New York, who provided defendants Fairmont and United Homes, at their behest, with a substantially over-inflated appraisal of the subject property. Upon information and belief, Jackson's principal place of

4

business is at 50 Harvard Street, Westbury, New York 11590.

12. Benjamin Turner is an attorney admitted to practice in New York. Upon information and belief, his principal place of business is 2800 Kings Highway, Brooklyn, New York 11229. Upon information and belief, United Homes regularly arranges for homebuyers to be represented by Mr. Turner. Upon information and belief, United Homes arranged for Mr. Turner to represent Ms. Wragg at the closing of the purchase and financing of the subject property. Turner did not protect Ms. Wragg's interests at or before closing.

13. America's Servicing Company ("ASC") is a company organized under the laws of Maryland, with its principal place of business located at 7495 New Horizon Way, Frederick, Maryland 21703. Upon information and belief, ASC is currently servicing Ms. Wragg's first mortgage. It is unclear, however, whether ASC owns Ms. Wragg's note and/or mortgage, or is just servicing it, because no assignment has been recorded with the Office of the City Register. In either scenario, ASC is a necessary party pursuant to Federal Rule of Civil Procedure 19.

14. Wilshire Credit Corporation ("Wilshire") is a company organized under the laws of Nevada, with its principal place of business located at 14523 SW Millikan Way, Suite 200, Beaverton, Oregon 97005. Upon information and belief, Wilshire is currently servicing Ms. Wragg's second mortgage. It is unclear, however, whether Wilshire owns Ms. Wragg's note and/or mortgage, or is just servicing it, because no assignment has been recorded with the Office of the City Register. In either scenario, Wilshire is a necessary party pursuant to Federal Rule of Civil Procedure 19.

15. XYZ-1 CORPORATION and XYZ-2 CORPORATION are fictitious names of

5

corporations that may have a legal interest in Ms. Wragg's mortgage. Although New York City's Office of the City Register does not indicate any assignments of Ms. Wragg's first and second mortgages from Fairmont to another company or companies, it is possible that such assignments were made, and have not been recorded or are not public record. It is Ms. Wragg's intention to promptly amend her complaint after discovery of any other companies that may have a legal interest in her mortgages and substitute these fictitious names for the actual companies that were assigned her mortgages, to add them as necessary parties under Federal Rule of Civil Procedure 19.

## FACTUAL ALLEGATIONS

16. After living in the same apartment for approximately 25 years, Ms. Wragg was forced to move after the owner of her apartment building decided to sell the building. In the Fall of 2002, Ms. Wragg started to look for a new place to live, and while looking for a new apartment to rent saw a United Homes advertisement selling "dream homes" in the Daily News. Ms. Wragg decided that she would use her life savings to try to purchase a house. In response to the Daily News advertisement, Ms. Wragg called United Homes and set up an appointment to look at houses.

17. Several days later, Ms. Wragg went to United Homes' office at 32 Fourth Avenue in Brooklyn for her appointment, where she met with a United Homes' employee named Raymond Smith. Ms. Wragg told Smith that she wanted a two-family property so that she could have rental income. A driver employed by United Homes took her to look at two properties, including the subject property at 4 Martense Court. Upon return to United Homes' office, Ms. Wragg told

6

Smith that she liked the subject property. Smith asked Ms. Wragg if she was ready to tender a downpayment of $3,000. Smith also informed her that she could close on the house in three weeks. Smith explained that the full downpayment was $20,000, but that she needed to tender $3,000 up front, and then $17,000 at or before closing. Ms. Wragg told Smith that she was not ready to commit to buying the house after seeing it only once.

18. Another United Homes' employee named Robert Cadosh contacted Ms. Wragg a few days later and asked her to come to United Homes' offices for another meeting. During that meeting, Cadoch introduced Ms. Wragg to an attorney named Benjamin Turner who he claimed could represent her. Turner told her that he did not work for United Homes, but he would be available to Ms. Wragg if she needed an attorney. Turner said that he showed no favoritism to United Homes. He also said that United Homes referred a lot of customers to him, and he would ensure that Ms. Wragg would get a good deal and that all the paperwork would be in order. Ms. Wragg responded that she did need an attorney, and Turner agreed to represent her for a fee. Several days later, Ms. Wragg gave United Homes a check for $3,000 for the downpayment.

19. Ms. Wragg also looked at the house again with her sons, Clarence and David Wragg. Ms. Wragg and her sons were concerned about the repairs that were needed, so they asked Cadosh when the repairs would be completed. For example, the floors in the rental unit were neither carpeted nor finished, there was faulty electrical wiring throughout the house, and the basement was unfinished. Cadosh told them not to worry about the repairs because United Homes would take care of everything.

20. During another meeting with Turner and Smith, Smith told Ms. Wragg that she

7

needed to take two mortgages, a first and a second mortgage, to purchase the property. He explained that it would be better because of her age. Turner agreed that it would be better for Ms. Smith to have a first and second mortgage. Ms. Wragg also met with a representative named Yael from Fairmont Funding. This meeting was arranged by United Homes and took place at United Homes' offices. Yael did not ask Ms. Wragg any questions about her income, but only verified the accuracy of basic information such as Ms. Wragg's social security number.

21. Ms. Wragg and her son, David, expressed their concern to Cadoch and Turner about the affordability of the mortgage. Cadoch assured Ms. Wragg that she did not need to worry about it because they would find a tenant with a public housing Section 8 voucher to rent the upstairs unit. Another United Homes employee named Barry Braxton even arranged for Ms. Wragg to meet the Section 8 tenant who would be renting her apartment. At no time did either Cadosh or Braxton tell Ms. Wragg that the property was a one-family property and that she therefore could not legally rent the upstairs unit.

22. In mid-November 2002, Cadosh and Smith repeatedly called Ms. Wragg to ask about the tender of the remainder of the downpayment. When Ms. Wragg showed some doubt in going through with the deal, Cadoch told her that she would lose her $3,000 downpayment. Smith asked Ms. Wragg to come to another meeting at United Homes' offices, and at that meeting he explained that her closing would be in seven days. Turner also asked her to sign several documents.

23. The closing took place on November 22, 2002, at United Homes' office. Ms. Wragg signed all of the mortgage papers and gave United Homes several checks totaling approximately

8

$17,000 for her downpayment, which represented most of Ms. Wragg's life savings. Ms. Wragg also paid Turner $850.00 for his legal fee. Ms. Wragg was concerned that some of the repairs were not yet completed, so at Ms. Wragg's request, Cadoch wrote out a "Renovation List"of repairs that were going to be completed by United Homes within 30 days after closing.  The repairs included ensuring the house was free from leaks, installing new sheetrock in the rear basement doorway ceiling, and fixing the gutter in the back of the house.

24.  United Homes and Fairmont insisted that Ms. Wragg take two mortgages to purchase the subject property.  The first mortgage with Fairmont is in the amount of $319,200, with a fixed interest rate of 7.375%, and monthly payments for principal and interest of $2,204.64.  The second mortgage is a 15-year mortgage with Fairmont in the amount of $59,850, with a fixed interest rate of 12.5%, and with monthly payments of $737.66.

25.  Ms. Wragg's only income at the time of the purchase of the subject property was approximately $830 a month, which consisted of Social Security benefits and a small pension. Although Ms. Wragg's son, David, has lived in the subject property since his mother purchased the house, he was a full-time student at the time of the purchase and was not employed. Despite the fact that the subject property is a legal one-family, the loan application that was processed by Jeremy Goldzal from Fairmont lists projected rental income of $1,500 a month as Ms. Wragg's only source of income.  The loan application also indicates that her first mortgage payment would be $2,995, including taxes and insurance.

26.  Ms. Wragg's combined monthly mortgage payments under the two loans are $2,942.23; when the monthly escrow payment to pay property taxes and homeowners insurance is

9

included, the combined monthly payments on the two loans are $3,367.73. Even if the rental income *were* legally collectable, Ms. Wragg's total monthly income would have been only $2,330 after the purchase of the subject property. Therefore, even including the non-existent rental income, the monthly mortgage payments exceeded Ms. Wragg's income by more than $1,000. Without this rental income, the payments exceeded Ms. Wragg's income by more than $2,500. Ms. Wragg was able to stay current on the two mortgages by making mortgage payments out of her savings, which is now depleted, and by foregoing paying other bills, such as gas and electric utilities.

27. United Homes promised Ms. Wragg that she would be able to afford monthly mortgage payments by renting the upstairs unit. After living in the property several months, however, Ms. Wragg discovered that the subject property is not a legal two-family property. Indeed, the Department of Buildings Certificate of Occupancy clearly states that the subject property is a one-family house. Therefore it is illegal for Ms. Wragg to rent out the upstairs unit. This information also should have been readily apparent from the appraisal, which Ms. Wragg has never seen, but which United Homes and Fairmont had access to before closing.

28. Before Ms. Wragg discovered that the subject property was a one-family home, the tenant that United Homes arranged to rent Ms. Wragg's rental unit paid approximately $450 a month and Section 8 paid $878. There were numerous problems with the tenant, and eventually Ms. Wragg had to threaten to evict the tenant, and the tenant moved out. Ms. Wragg is now unable to rent out the unit again because of its illegal status.

29. Upon information and belief, First Universal Network was a mortgage broker on the

10

subject transaction; however, Ms. Wragg did not know about First Universal Network's involvement. Ms. Wragg paid numerous fees to Fairmont, and to First Universal Network. For example, Ms. Wragg paid $3,192 for a loan origination fee to First Universal Network, a fee that is typically paid to the lender, not the broker. Moreover, Fairmont charged Ms. Wragg a $6,384 loan discount fee. Many of the fees that Fairmont and First Universal Network charged Ms. Wragg were duplicative and unnecessary. For example, in addition to the $3,192 loan origination fee paid to First Universal Network, Ms. Wragg also paid a $200 underwriting fee to Fairmont, and a $500 application fee and a $200 process fee to First Universal Network. The fees paid to Fairmont, its settlement agent, Nationwide Settlement, and First Universal Network total over $11,400.

30. The Good Faith Estimate also indicates that Ms. Wragg paid a $750 appraisal fee to Peter Jackson. This appraisal fee exceeds industry norms. Moreover, Fairmont's "Lock-in-Agreement" indicates that the appraised value of the house is $410,000.

31. On or about December 2, 2002, Ms. Wragg moved into the subject property. There were a number of repairs that were not completed as promised by United Homes. Ms. Wragg made numerous calls to United Homes' customer service line, and United Homes made some of the repairs. Several repairs, however, including some items on the "Renovations List" dated November 22, 2002, were not completed. For example, the gutter in the back of the house was never fixed and sheetrock was never installed in the rear basement door ceiling.

32. South Brooklyn Legal Services commissioned an appraisal of Ms. Wragg's house to determine the true market value of the house at the time of purchase in November 2002. The

11

appraisal indicates that the accurate fair market value of the house in November 2002 was $250,000. The appraisal reports that the subject property is a one-family house, and no certificate of occupancy legalizing the second unit is available. The appraisal also reveals that the original appraiser failed to perform the due diligence research required because the public assessment states that the subject property is a one-family dwelling.

33. United Homes and Fairmont rushed the entire home-buying process. In fact, less than two months lapsed from the time that Ms. Wragg first saw the subject property until the time she closed. Moreover, during the home buying process, United Homes employees, including Cadoch and Smith, repeatedly called Ms. Wragg to push her to close as soon as possible.

34. United Homes also controlled all aspects of the home buying process by providing every professional for the transaction. For example, United Homes arranged for Turner to represent Ms. Wragg and arranged for funding from Fairmont.

35. Records from the Office of the County Register reveal that United Homes purchased the subject property on August 27, 2002 for $230,000, and resold it to Ms. Wragg on November 22, 2002 for $399,000, a mark-up of $169,000. United Homes purchased the subject property from a company named Golani, Inc., which bought the subject property for $180,000 only three weeks before it sold the subject property to United Homes.

36. Struggling to pay mortgage payments that exceed her income, Ms. Wragg has used all of her savings to try to keep up with the mortgage payments, but has begun to fall behind on her payments. She is now at risk of losing her home in foreclosure.

37. A review of 32 properties sold by United Homes since 2002 reveals a serious pattern

of property flipping: almost all of the properties were held by United Homes for several months at the most, and United Homes charged an average markup of $160,000 for each property. The vast majority of the properties were bought and sold in predominately non-white neighborhoods.

## FIRST CAUSE OF ACTION
### (AGAINST UNITED HOMES, FAIRMONT, FIRST UNIVERSAL NETWORK, JACKSON, AND TURNER)

### NEW YORK STATE GENERAL BUSINESS LAW § 349

38. Ms. Wragg reasserts and realleges paragraphs "1" through "37" as though fully set forth herein.

39. United Homes, Fairmont, First Universal Network, Jackson, and Turner "conducted a business" and/or "furnished a service" within the meaning of the New York State General Business Law § 349 (the "Deceptive Practices Act").

40. United Homes, Fairmont, First Universal Network, Jackson, and Turner violated the Deceptive Practices Act by engaging in acts and practices in connection with Ms. Wragg's home purchase and financing transaction which were misleading in a material way, unfair, deceptive, and contrary to public policy and generally recognized standards of business, and which harm the public at large, including but not limited to:

a. intentionally over-appraising the subject property, in violation of the Uniform Standards of Professional Appraisal Practice and N.Y. Comp. Codes R. & Regs. tit. 19, § 1106 *et seq.*, and/or causing it to be over-appraised, to induce Ms. Wragg to purchase it at a price that far exceeded its fair market value;

b. misleading Ms. Wragg by representing that the property she was purchasing was

13

priced at the fair market value;

  c. "flipping" the property at 4 Martense Court, by purchasing the property and then selling it to Ms. Wragg 86 days later at a mark-up of $169,000, based on an intentional over-valuation of the property;

  d. marketing, selling, and representing the subject property as a two-family property, when in fact it is legally designated on the Certificate of Occupancy as a one-family property;

  e. making two completely unaffordable loans to Ms. Wragg that had combined monthly payments that exceeded her current and expected income;

  f. making an entirely gratuitous second mortgage to Ms. Wragg that wholly exceeded the fair market value of the property;

  g. misrepresenting to Ms. Wragg that she would be able to afford the mortgage based on rental income, including rental income in the loan application, and arranging for a Section 8 tenant to rent a second unit, when the subject property is in fact only a legal one-family property, so that any rental of a second unit would be illegal;

  h. misrepresenting to Ms. Wragg that the property would be fixed and habitable, to induce Ms. Wragg to purchase the property in subpar condition;

  i. arranging for Turner to represent Ms. Wragg to steer her away from the independent advice of counsel and to create the appearance that Ms. Wragg's interests were adequately represented when in fact Ms. Wragg's interests were not protected;

  j. charging Ms. Wragg $750 for an appraisal, well beyond any reasonable industry

14

standard, and charging her Turner's $850 fee, then failing to disclose these fees as finance
charges, as required by federal law (12 C.F.R. §226.4(c)(7));

      k.  charging Ms. Wragg over $11,000 in fees on the first mortgage, many of which
were duplicative and gratuitous, such as a $3,192 loan origination fee paid to First Universal
Network, a $200 underwriting fee to Fairmont, and a $500 application fee and a $200 process fee
to First Universal Network.

      l.  misrepresenting numerous critical and material aspects of the home purchase
and financing transaction, as described above; and

      m.  targeting people of color including Ms. Wragg, and primarily non-white
neighborhoods, and offering real estate transactions on terms that are grossly unfair and inferior to
those available to white prospective home buyers.

    41.  Upon information and belief, these unfair business practices directed at Ms. Wragg
were part of, and representative of, a pattern of misleading activities targeted at numerous other
home buyers.

    42.  Ms. Wragg suffered serious injury as the proximate result of such deceptive practices.

## SECOND CAUSE OF ACTION
## (AGAINST UNITED HOMES, FAIRMONT, AND JACKSON)

### FRAUD

    43.  Ms. Wragg reasserts and realleges paragraphs "1" through "42" as though fully set
forth herein.

    44.  United Homes, Fairmont, and Jackson knowingly and intentionally caused the
property to be over-appraised by $149,000; and knowingly and intentionally made false

statements and omissions of material fact to Ms. Wragg regarding the home purchase and financing, specifically concerning but not limited to the fair market value of the property, the condition of the subject property, and representing that the property is a two-family home and she could afford the mortgage payments based on the rental income, when in fact such rental would be illegal.

45. United Homes, Fairmont, and Jackson offered these statements as fact, not opinion, with the intent that they induce Ms. Wragg to purchase and finance the subject property.

46. Such statements and omissions were false and misleading at the time they were made.

47. Ms. Wragg had a reasonable right to rely, and in fact relied, on Fairmont, United Homes, and Jackson's statements of fact and omissions in agreeing to purchase and finance the subject property. Had Ms. Wragg known the truth about the issues enumerated above, she would not have purchased and financed the property.

48. As a direct and proximate result of these false and misleading statements and omissions, and Ms. Wragg's reasonable reliance on these statements and omissions, Ms. Wragg suffered damages.

### THIRD CAUSE OF ACTION
### (AGAINST UNITED HOMES, FAIRMONT, AND JACKSON)

### CIVIL CONSPIRACY TO DEFRAUD

49. Ms. Wragg reasserts and realleges paragraphs "1" through "48" as though fully set forth herein.

50. United Homes, Fairmont, and Jackson knowingly entered into an agreement to fraudulently induce Ms. Wragg to purchase and finance the subject property at an inflated price by

16

intentionally causing the property to be over-appraised, and intentionally making material
misrepresentations, as described above.

51.  Ms. Wragg suffered serious injury as the proximate result of her reasonable and
justified reliance on such intentional and material misrepresentations and failures to disclose.

## FOURTH CAUSE OF ACTION
### (AGAINST JACKSON)

### NEGLIGENCE

52.  Ms. Wragg reasserts and realleges paragraphs "1" through "51" as though fully set
forth herein.

53.  Jackson owed Ms. Wragg a duty to accurately appraise the subject property.
Specifically, Jackson was required to make a determination of the value of the property by
examining values and home sales of comparable properties. Jackson knew or should have known
that the subject property was a one-family property; accordingly, he should have looked to values
of one-family properties, not two-family properties, in assessing the value of the property.
According to the Uniform Standards of Professional Appraisal Practice ("USPAP") issued by the
National Association of Real Estate Appraisers, which are partially codified in New York State
regulations, Jackson was ethically obligated to "perform assignments with impartiality,
objectivity, and independence, and without accommodation of personal interests." *See* Uniform
Standards of Professional Appraisal Practice, Ethics Rule (2004) (available at
www.appraisalfoundation.org); N.Y. Comp. Codes R. & Regs. tit. 19, § 1106.1(b)(3). Moreover,
an appraiser must not use or communicate a misleading or fraudulent report or knowingly permit
an employee or other person to communicate a misleading or fraudulent report. *Id.*; N.Y. Comp.

17

Codes R. & Regs. tit. 19, § 1106.1(b)(4). Furthermore, when appraising personal property, appraisers are obligated to "not commit a substantial error of omission ... that significantly affects an appraisal; and not render appraisal services in a careless or negligent manner." *Id.* at Standards Rule 7-1; N.Y. Comp. Codes R. & Regs. tit. 19, § 1106.2(a)(2)(iii). USPAP commentary to Standards Rule 7-1 requires an appraiser to use due diligence and due care. *Id.* Ms. Wragg reasonably relied on Jackson's determination of the inflated market value of the subject property in her decision to purchase the subject property for $399,000.

54. Jackson breached his duty by, *inter alia,* failing to perform due diligence; failing to maintain impartiality by allowing Fairmont and/or United Homes to influence him to inflate the value of the property; using inadequate comparable properties to determine the value of the subject property; and conveying to Fairmont and/or United Homes an inflated market value of the property knowing Fairmont and/or United Homes would, and in fact did, inform Ms. Wragg of Jackson's determination of the value of the property.

55. Ms. Wragg suffered serious injury as the proximate result of Jackson's breach of his duty.

### FIFTH CAUSE OF ACTION
### (AGAINST FAIRMONT)

### TRUTH IN LENDING ACT, 15 U.S.C. §1601 *et seq.*

56. Ms. Wragg reasserts and realleges paragraphs "1" through "55" as though fully set forth herein.

57. Upon information and belief, Fairmont regularly engages in the making of mortgage

18

loans, and is therefore subject to the Truth in Lending Act (hereinafter "TILA"), 15 U.S.C. §1601

*et seq.*, and Federal Reserve Board Regulation Z, 12 C.F.R. § 226, which implements TILA.

58.   Upon information and belief, in the course of the consumer credit transaction between

Fairmont and Ms. Wragg, Fairmont violated the disclosure requirements of TILA and Regulation

Z in the following respects:

a.   by improperly failing to disclose in the finance charge certain charges

imposed by Fairmont directly and indirectly as incident to the extension of credit, in violation of

15 U.S.C. § 1638(a)(3) and Regulation Z § 226.4 and 226.18(d);

b.   by failing to disclose the $750 appraisal fee in the finance charge

because such fee is not bona fide and reasonable under Regulation Z § 226.4(c);

c.   by improperly disclosing the amount financed, in violation of 15 U.S.C.

§ 1638(a)(2)(A) and Regulation Z § 226.18(b); and

d.   by improperly disclosing the annual percentage rate (APR), in violation

of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(e).

## SIXTH CAUSE OF ACTION
### (AGAINST UNITED HOMES)

### FAIR HOUSING ACT, 42 U.S.C. §§ 3604, 3605

59.   Ms. Wragg reasserts and realleges paragraphs "1" through "58" as though fully set

forth herein.

60.   United Homes and its principals and employees, discriminated against Ms. Wragg by

providing to Ms. Wragg grossly inferior terms, conditions, and/or privileges of the sale and

services in connection with the sale and financing transaction on the basis of race and color.

19

These actions were taken deliberately and with racially discriminatory intent, and with reckless disregard for Ms. Wragg's rights. These actions were intended to and did exploit the segregated, dual housing market that exists in New York City, and constituted "reverse redlining" in violation of the Fair Housing Act, 42 U.S.C. § 3604.

61. United Homes, and its employees and principals, discriminated against Ms. Wragg on the basis of race and color in a residential real estate-related transaction in violation of the federal Fair Housing Act, 42 U.S.C. § 3605. Such discriminatory actions include but are not limited to selling, brokering, and appraising residential real property, all on grossly unfavorable terms based on Ms. Wragg's race and color.

62. In addition, United Homes engaged in a pattern of discriminatory practices related to housing that resulted in a disparate impact to the detriment of non-white prospective home buyers in, and residents and would-be residents in communities of color throughout New York City.

63. As a proximate result of such discriminatory housing practices, Ms. Wragg has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of her home.

## SEVENTH CAUSE OF ACTION
### (AGAINST UNITED HOMES)

### EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. §1691 *et seq.*

64. Ms. Wragg reasserts and realleges paragraphs "1" through "63" as though fully set forth herein.

65. United Homes and its employees and principals, discriminated against Ms. Wragg

20

with respect to a credit transaction in violation of the federal Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, by arranging for Ms. Wragg to take an injurious home mortgage loan on the basis of race and color.

66. Upon information and belief, United Homes, in the ordinary course of business, regularly refer applicants or prospective applicants to creditors, or select or offer to select creditors to whom requests for credit may be made, on the basis of race and color.

67. Such activities constitute a pattern and practice of credit discrimination by "reverse redlining," targeting individuals on the basis of their race, color, and their neighborhoods of residence to induce them to enter injurious home mortgage loans. These actions were taken deliberately and with racially discriminatory intent, with reckless disregard for Ms. Wragg's rights.

68. United Homes engaged in a pattern of discriminatory practices related to housing that resulted in a disparate impact to the detriment of non-white prospective home buyers in, and residents and would-be residents in communities of color throughout New York City.

69. As a proximate result of the racially discriminatory actions of United Homes, Ms. Wragg has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of her home.

### EIGHTH CAUSE OF ACTION
### (AGAINST UNITED HOMES)

### DEPRIVATION OF CIVIL RIGHTS IN VIOLATION OF
### 42 U.S.C. §§ 1981, 1982 and 1985

70. Ms. Wragg reasserts and realleges paragraphs "1" through "69" as though fully set

forth herein.

71.  United Homes has by its actions described above exploited the segregated, dual housing market that exists in New York City, seeking out buyers who will accept unreasonable terms and conditions of sale and financing.  Such actions were taken deliberately and with racially discriminatory intent, and with reckless disregard for Ms. Wragg's rights.

72.  This racially discriminatory pattern of acts and conduct constitutes "reverse redlining" and denied Ms. Wragg the same rights to make and enforce contracts, and to enjoy the full and equal benefit of the laws, as are enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1981.

73.  Furthermore, such acts and conduct denied Ms. Wragg the same rights to inherit, purchase, lease, sell, hold and convey real property, as are enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1982.

74.  Finally, such pattern of actions constituted a conspiracy for the purpose of depriving Ms. Wragg of the equal protection of the laws, or of equal privileges and immunities of the laws of the United States, in violation of 42 U.S.C. § 1985(3).

75.  As a proximate result of these racially discriminatory actions, Ms. Wragg has suffered economic loss, mental anguish, deprivation of civil rights, and the prospective loss of her home.

## NINTH CAUSE OF ACTION
### (AGAINST TURNER)

### LEGAL MALPRACTICE

76.  Ms. Wragg reasserts and realleges paragraphs "1" through "75" as though fully set forth herein.

22

77. As Ms. Wragg's attorney, Turner owed Ms. Wragg a duty to exercise that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community. Turner breached his duty and failed to exercise the required degree of care by, *inter alia*:

a. representing Ms. Wragg even though Turner, upon information and belief, has a long-standing business relationship with United Homes, thereby creating an unwaivable conflict of interest in violation of the New York State Bar Association's Lawyer's Code of Professional Responsibility DR5-105;

b. failing to avoid influence by others by allowing United Homes to arrange for Turner to represent numerous homebuyers in transactions with United Homes in violation of the New York State Bar Association's Lawyer's Code of Professional Responsibility DR5-107;

c. advising Ms. Wragg to enter into the subject mortgage transaction even though the loan was entirely unaffordable and the terms violated state and federal law;

d. failing to conduct a reasonable investigation into Ms. Wragg's ability to repay the loan;

e. failing to determine and/or convey to Ms. Wragg that the subject property was only a legal one-family, not a two-family property as she had been led to believe; and

f. soliciting Ms. Wragg in person in violation of the New York State Bar Association's Lawyer's Code of Professional Responsibility DR2-103; and

g. falsely claiming that he showed no favoritism to United Homes to induce Ms. Wragg to hire him, to create the appearance that Ms. Wragg's interests would be protected, and to steer her away from the advice of independent counsel.

DATED:     April 1, 2004
           BROOKLYN, NEW YORK

PAMELA SAH, ESQ. (PS -9333)
BRIGITTE AMIRI, ESQ. (BA-8479)
SOUTH BROOKLYN LEGAL SERVICES
Foreclosure Prevention Project
105 Court Street, 3rd Floor
Brooklyn, New York 11201
(718) 237-5500
Attorneys for Margaret Wragg

25